IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| JACK M. GARRISON; the GARRISON ) FAMILY LLC, a Washington limited ) liability company; LESA B. NEUGENT, ) individually and as Trustee of the JACK ) M. GARRISON AND CHARLOTTE L. ) GARRISON REVOCABLE TRUST, the ) JACK M. GARRISON SURVIVOR'S ) TRUST, the CHARLOTTE L. ) GARRISON MARITAL TRUST, the ) CHARLOTTE L. GARRISON EXEMPT ) MARITAL TRUST; the CHARLOTTE L. ) GARRISON EXEMPT FAMILY TRUST ) FBO MARK GARRISON, and the ) CHARLOTTE L. GARRISON EXEMPT ) FAMILY TRUST FBO LESA NEUGENT, ) | No. 69625-4-1-I DIVISION ONE ORDER GRANTING MOTION FOR RECONSIDERATION IN PART AND WITHDRAWING AND SUBSTITUTING OPINION | |

Appellants,

v.

SAGEPOINT FINANCIAL, INC., a
Delaware corporation licensed to
business in Washington, f/k/a AIG
FINANCIAL ADVISORS, INC.,

Respondent,

MARK M. GARRISON and MICHELLE
GARRISON, his wife, and their marital
community,

Defendants.

Respondent AIG Financial Advisors Inc. filed a motion to reconsider the

opinion filed on July 14, 2014, and the Garrison Trusts filed an opposition to the

motion. The panel has determined that reconsideration of the analysis of the last antecedent rule should be granted but in all other respects the motion to reconsider denied, and the opinion filed on July 14, 2014 should be withdrawn and a substitute opinion filed. Now, therefore, it is hereby

ORDERED that respondent's motion for reconsideration is granted in part but in all other respects the motion to reconsider is denied, and the opinion filed on July 14, 2014 shall be withdrawn and a substitute opinion shall be filed.

DATED this 30th day of JANUARY, 2015.

Schindler, J.

Cox, J.

Spearman, C.J.

IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| JACK M. GARRISON; the GARRISON FAMILY LLC, a Washington limited liability company; LESA B. NEUGENT, individually and as Trustee of the JACK M. GARRISON AND CHARLOTTE L. GARRISON REVOCABLE TRUST, the JACK M. GARRISON SURVIVOR'S TRUST, the CHARLOTTE L. GARRISON MARITAL TRUST, the CHARLOTTE L. GARRISON EXEMPT MARITAL TRUST; the CHARLOTTE L. GARRISON EXEMPT FAMILY TRUST FBO MARK GARRISON, and the CHARLOTTE L. GARRISON EXEMPT FAMILY TRUST FBO LESA NEUGENT, ) | No. 69625-4-1-I<br><br>DIVISION ONE |
| Appellants, | |
| v. | PUBLISHED OPINION |
| SAGEPOINT FINANCIAL, INC., a Delaware corporation licensed to business in Washington, f/k/a AIG FINANCIAL ADVISORS, INC., | |
| Respondent, | |
| MARK M. GARRISON and MICHELLE GARRISON, his wife, and their marital community, | |
| Defendants. | FILED: January 20, 2015 |

SCHINDLER, J. — Mark M. Garrison was a licensed investment advisor and co-

owner of a financial advice firm, Acumen Financial Group Inc. In 1999, Mark[1] entered into an independent contractor agreement with AIG Financial Advisors Inc. to act as a registered securities representative (stockbroker). In 2002, Mark's grandparents Jack and Charlotte Garrison established the Garrison Family LLC. In 2006, Jack and Charlotte transferred all of the assets of the LLC to the Jack M. Garrison and Charlotte L. Garrison Revocable Trust (Revocable Trust). The Revocable Trust designates Jack and Charlotte as the cotrustees and income beneficiaries, and names Mark and his sister Lesa B. Neugent as the remainder beneficiaries. The Garrison Family LLC and the Revocable Trust held approximately $26 million in two brokerage accounts at Wells Fargo Investments LLC. After Charlotte died in August 2006, Jack appointed Mark as the sole manager and trustee of the Garrison Family LLC and the Revocable Trust.

In April 2011, Jack Garrison, Lesa Neugent, the Revocable Trust, and the trusts created after Charlotte's death (collectively Garrison Trusts) filed a lawsuit against Mark and SagePoint Financial, formerly known as AIG Financial Advisors Inc., alleging joint and several liability for the loss of more than $20 million and claims of breach of fiduciary duty; negligent supervision; violation of the "Washington State Securities Act" (WSSA), chapter 21.20 RCW; and respondeat superior. AIG filed a motion for summary judgment dismissal arguing that under National Association of Securities Dealers (NASD) Rule 3050, Transactions for or by Associated Persons (amended effective Oct. 15, 2002), AIG had no duty to supervise the transactions in the Wells Fargo accounts. The Garrison Trusts filed a cross motion for summary judgment, arguing AIG owed a duty to supervise under NASD Rule 3040, Private Securities Transactions of an

---

[1] We refer to members of the Garrison family by their first names for purposes of clarity.

<u>Associated Person</u> (amended effective March 23, 2004). In the alternative, the Garrison Trusts argued AIG had a duty to investigate and monitor the suspicious activity in the Wells Fargo brokerage accounts. The court granted AIG's motion for summary judgment and dismissed the claims against AIG. We affirm dismissal of the respondeat superior claim against AIG. Because there are material issues of fact as to whether AIG knew or should have known by October 2007 that Mark was acting as an investment advisor for compensation triggering a duty under the NASD Rules to either supervise the securities transactions in the Wells Fargo brokerage accounts or to investigate and monitor the securities transactions in the Wells Fargo accounts, we reverse summary judgment dismissal on the claims against AIG for negligent supervision and violation of the WSSA.

FACTS

Mark M. Garrison was a licensed investment advisor registered with the United States Securities and Exchange Commission (SEC). Beginning in 1995, Mark was co-owner of a financial investment advice firm in Bloomington, Minnesota, Acumen Financial Group Inc.

In 1999, Mark entered into an "Independent Contractor Agreement for Registered Representative" with AIG Financial Advisors Inc.[2] AIG is a securities broker-dealer registered with the SEC and a member of the National Association of Securities Dealers (NASD).[3] As a licensed registered securities representative or stockbroker, Mark also registered with the SEC.

---

[2] AIG is now known as SagePoint Financial Inc.

[3] In 2007, the two self-regulatory organizations, NASD and the regulatory arm of the New York Stock Exchange (NYSE), merged and are now jointly known as the Financial Industry Regulatory Authority (FINRA).

3

As part of the Independent Contractor Agreement with AIG, Mark agreed to comply with "the statutes, rules, regulations and statements of policy of the [SEC], the Conduct Rules of the NASD and any state securities and insurance laws and regulations," and AIG policies and procedures. Mark agreed to notify AIG "in writing of any outside business activity prior to engaging in such activity."[4] The Independent Contractor Agreement states, in pertinent part:

> I will notify the Company in writing of any outside business activity prior to engaging in such activity. I will not engage in any conduct which conflicts with the business of the Company, nor will I engage in any conduct which is not the business of the Company at the location where I conduct the business of the Company without advising the Company of such business activity in writing. I will not accept or retain employment or compensation from any person or business or as a self-employed person as a result of business activity outside the scope of my affiliation with the Company without advising the Company in writing of such employment or compensation. I agree to make books and records with respect to my outside business activities available to the Company upon request.[5]

Mark's grandparents Jack M. Garrison and Charlotte L. Garrison owned a shipping company. In 2002, Jack and Charlotte established the Garrison Family LLC, transferring approximately $11 million to the LLC. Jack and Charlotte were the sole shareholders and Jack was named the manager of the LLC. The Garrison Family LLC assets were held in brokerage accounts at the Seattle branch of Wells Fargo Investments. Jack worked with Wells Fargo registered securities representatives Jean Adams and Rebbie Thomas.

In 2006, Jack and Charlotte established the Jack M. Garrison and Charlotte L. Garrison Revocable Trust. Jack and Charlotte transferred their Garrison Family LLC shares plus approximately $16 million into the Revocable Trust. The "Revocable Living

---

[4] Emphasis added.
[5] Emphasis added.

4

Trust Agreement" designates Jack and Charlotte as the cotrustees and lifetime beneficiaries of the trust, and names their grandchildren Mark M. Garrison and Lesa B. Neugent as the remainder beneficiaries, with a 62 percent interest allocated to Mark and a 38 percent interest to Neugent. The Revocable Trust directs the creation of several other trusts upon the death of either Jack or Charlotte—an exempt marital trust, a marital trust, a survivor trust, an exempt family trust for the benefit of Neugent, and an exempt family trust for the benefit of Mark.[6]

Charlotte died on August 8, 2006. Shortly after her death, Jack was diagnosed with dementia. On September 11, 2006, Jack resigned and appointed Mark as the manager of the Garrison Family LLC and the trustee of the Revocable Trust.

Over the years, Jack had invested conservatively in the Wells Fargo brokerage accounts. In September 2006, the assets in the Wells Fargo accounts for the Garrison Family LLC and the Revocable Trust totaled approximately $26.5 million, consisting of approximately $21.8 million in the LLC brokerage account, $4.6 million in the Revocable Trust brokerage account, and $120,000 in the LLC checking account.

In compliance with NASD Rule 3050, on October 6, 2006, Wells Fargo sent a letter requesting approval of Mark's appointment as "trustee, owner and manager on accounts held with our firm." The letter states, in pertinent part:

> This letter is to inform you that Mark M[.] Garrison, an employee of your firm, has requested to be appointed trustee, owner and manager on

---

[6] Upon the death of either Jack or Charlotte, the Revocable Living Trust Agreement also designates "Specific Cash Gifts" in the amount of $200,000 each to "accountant and friend" Hal Carrothers, Wells Fargo "financial advisor and friend" Jean Adams, and Wells Fargo "financial advisor and friend" Rebbie Thomas.

accounts held with our firm. In order to execute his request, we must have approval in writing from your Compliance Officer (Rule 407 letter).[7]

On October 16, 2006, Mark's assistant faxed the Wells Fargo letter to the AIG Compliance Department. The cover sheet states, in pertinent part:

> [P]lease find a letter from the Seattle, WA office of Wells Fargo requesting approval from your department for Mark Garrison to act as the trustee, owner and manager on accounts held in a trust for Mark's grandparents. Please forward your approval to the address shown on the Wells Fargo letterhead.

On November 14, 2006, the AIG Compliance Department sent Mark a "Letter of Understanding for Acting as Trustee/Owner/Manager on the Garrison Wells Fargo Accounts." The letter states that AIG does not object to Mark acting as the "trustee/owner/manager" on the conditions that Mark does not act as a registered representative/stockbroker and that he complies with the requirements to disclose annually his outside business activity on the AIG "Outside Business Activities Questionnaire" (OBAQ). The November 14 letter states, in pertinent part:

> **Re:   Letter of Understanding for Acting as**
> **Trustee/Owner/Manager on the Garrison Wells Fargo**
> **Accounts (#s W35823867, 745-1146604, & W29758675)**
>
> Dear Mr. Garrison:
>
> This letter will serve as your record that AIG Financial Advisors, Inc. ("AIGFA") is aware that you are trustee/owner/manager on the above-referenced Garrison accounts held at Wells Fargo. AIGFA does not object to your participation in this activity as long as the following are met:
>
> 1.  You sign and return the attached Indemnification Form;
>
> 2.  You may not act as the representative of record for these or any

---

[7] NYSE Rule 407, Transactions—Employees of Members, Member Organizations and the Exchange (amended effective Dec. 15, 2008), is equivalent to NASD Rule 3050. See FINRA Regulatory Notice 09-22, FINRA Requests Comment on Proposed Consolidated FINRA Rule Governing Personal Securities Transactions for or by Associated Persons (discussing consolidation of NYSE Rule 407 and NASD Rule 3050).

other accounts of Garrison (held at Wells Fargo or elsewhere);

3. You are limited to acting solely as the trustee/owner/manager for the above referenced accounts; you are otherwise prohibited from acting in any capacity as the trustee/owner/manager for anyone and/or any accounts outside of your immediate family;

4. Copies of statements for Garrison accounts should be maintained in a centralized file in your OSJ [(Office of Supervisory Jurisdiction)] Branch Office. It is not necessary for the Home Office to receive duplicate statements;

5. You must maintain a copy of this letter as well as the amended Indemnification Form (attached hereto and alluded to in item #1 above) in your office at all times; and

6. This activity must be disclosed on your Outside Business Activity Questionnaire on an annual basis.[8]

On November 22, the AIG director of branch supervision, Leslie Ayers, sent a letter to Mark approving maintaining the brokerage accounts at Wells Fargo as the trustee, owner, and manager subject to his compliance with NASD regulations and AIG policies, receipt of duplicate "confirms and statements" from Wells Fargo for the accounts, and monitoring by the "First Line Supervisor." The November 22 letter states, in pertinent part:

Re:  Outside Account for W35823867, 745-1146604 & W29758675

Dear Mark Garrison,

. . . .

The Compliance and Regional Management departments at AIG Financial Advisors, Inc. do not object to Mark Garrison maintaining an account at Wells Fargo. Please note that this letter addresses only the account number provided above. Any additional accounts must be acknowledged in writing by the Home Office prior to opening.

In order to comply with federal and NASD regulations, it is necessary for the First Line Supervisor to monitor all Registered Representative-related

---

[8] Emphasis in original.

accounts. In order to demonstrate and document compliance with these rules, all parties must agree to abide by the following:

Mark Garrison agrees that:

- He will not participate in purchasing any securities in an Initial Public Offering (IPO) as it is against AIG Financial Advisors' policy.
- He will comply with AIG Financial Advisors' policies regarding personal brokerage accounts and all other policies, including but not limited to Anti-Money Laundering Policies which are located in the Firm's <u>Sales Practice Manual</u> and Compliance Journals.
- He must enter orders on the same side of the market for clients ahead of orders placed for RR [(registered representative)] in an identical security.

Please note: the firm will ensure that duplicate confirms and statements are being received by the FLS [(First Line Supervisor)] for supervision purposes.[9]

Attached to the letter is an addendum describing the "First Line Supervisor Responsibilities for Outside Personal Brokerage Accounts." The addendum lists a number of "[p]rohibited activities," including insider trading, prearranged trading, adjusted trading, "Wash or Cross Transactions," "Front running," and "Freeriding." The addendum also states, "If the RR has a large number of trades every month, the FLS should perform a quarterly profit and loss analysis to determine whether the RR's account has large losses (increasing incentive to churn their clients' accounts)." From April 2006 through April 2009, Director of Branch Supervision Ayers was responsible for "supervising the [AIG] personnel who monitored the transactions in personal brokerage accounts in the name or for the benefit of [AIG] registered representatives, including Mark M. Garrison, held at other broker-dealers." Michelle Nielsen reported to Ayers and was the First Line Supervisor for the Wells Fargo brokerage accounts.

---

[9] Emphasis in original.

In December 2006, Mark submitted his annual OBAQ to AIG for 2005 to 2006. Mark states he is not an AIG "investment provider representative" but reports that he is a registered investment adviser and owns Acumen, "an independent registered investment adviser, separate from [AIG]." Mark states he is registered as an investment advisor in approximately 20 states and receives compensation from commissions, hourly estate planning fees, and asset-based fees. Mark also states he understands "that with respect to investment advisory activities," he "must make clear to clients that such investment advisory activities are separate from the broker-dealer [AIG] and are not offered by the broker-dealer [AIG]." In the OBAQ, Mark states that the percentage of time he spends as an investment advisor with Acumen is 26 to 50 percent and that he receives compensation over $50,000.

Under the 2005 to 2006 OBAQ section "Other Activities," Mark states that "I have been named the Trustee/Owner/Manager on accounts held at Wells Fargo Investments in Seattle, WA, for my grandfather - Jack Garrison." Mark reports spending "0-25%" of his time "conducting this activity" and receiving "[u]nder $10,000" annually.

On March 14, 2007, Mark sent an e-mail to Wells Fargo stockbrokers Jean Adams and Rebbie Thomas and the accountant for the Revocable Trust, Hal Carrothers, stating that he planned to hire Acumen to provide investment advice to the Garrison Family LLC and the Garrison trusts but that Wells Fargo would continue to execute trades. The e-mail states, in pertinent part:

> In addition to the TRUSTEE'S FEE of .80% annually (.20% quarterly) which we have already established, I have decided to hire Acumen Financial Group, Inc. [(AFG)] to provide INVESTMENT ADVISORY SERVICES to the LLC and various trusts. Since Jack has a strong relationship with Jean Adams and Rebbie Thomas at Wells Fargo, I will leave the money/investments there for now to handle the execution on

9

trading within the accounts, and simply hire Acumen Financial Group, Inc. for the investment advice. As you know, I am one of the owners of AFG. AFG will charge 1.2% annually for Investment Advisory Services, or .30% quarterly. . . .

. . . .

SECOND, JEAN & REBBIE - To take advantage of current market weakness, please invest an extra $100,000 into each of the existing MUTUAL FUNDS in the LLC AND [REVOCABLE] TRUST. Do not add anything more to [the other trusts] at this time. I may call in a trade today or tomorrow . . . but that will be separate from the $100,000 per existing Mutual fund order. Sell enough bonds to cover these costs, PLUS enough to cover all the checks above, any liquidity Hal might need, AND whatever amount you expect to transfer over to the [Revocable] Trust from the LLC as part of your regular quarterly program.

Do NOT show Jack any Excel Spreadsheets until further notice. I will give you the "all clear" once the markets rebound, which I expect to be in 2-3 months.

On March 16, 2007, Mark wrote a check to Acumen in the amount of $65,524 from the Garrison Family LLC account for "Investment Advisory Services" in the fourth quarter of 2006. Mark also wrote a check to Acumen in the amount of $13,905 from the Revocable Trust account.

Mark submitted his 2007 annual OBAQ to AIG on October 30, 2007. Mark reports his outside business activity and compensation as an independent registered investment advisor and co-owner of his independent investment business Acumen. In a separate section under "Other: Outside Business Activities," Mark reports that he is "actively engaged" as the "named . . . Trustee/Owner/Manager on accounts held at Wells Fargo Investments in Seattle, WA, for my grandfather - Jack Garrison." Mark also reports it is an "[i]nvestment related activity"[10] conducted by Acumen, a "Registered Investment Advisor." Mark states that he spends 16 hours per month and receives

---

[10] Emphasis in original.

10

annual compensation of "$25,000 to $50,000."

In late 2007, Mark submitted a written request to AIG seeking approval to open personal brokerage accounts at TD Ameritrade. In December 2007, AIG approved the request in writing for the "personal brokerage accounts held at TD Ameritrade in the name of Mark Garrison including Account No. 789-930283, and . . . an account in the name of Michelle Garrison, Account No. 789-654167." AIG instructed Mark to provide duplicate copies of "confirmation slips and account statements" for the TD Ameritrade accounts.

On April 22, 2011, Jack M. Garrison, the Garrison Family LLC, and Mark's sister Lesa B. Neugent, individually and as trustee of the Jack M. Garrison and Charlotte L. Garrison Revocable Trust, the Jack M. Garrison Survivor's Trust, the Charlotte L. Garrison Marital Trust, the Charlotte L. Garrison Exempt Marital Trust, the Charlotte L. Garrison Exempt Family Trust for the benefit of Mark Garrison, and the Charlotte L. Garrison Exempt Family Trust for the benefit of Lesa Neugent (collectively the Garrison Trusts), filed a lawsuit against Mark and Michelle Garrison and AIG for "Securities Law violations, Breach of Fiduciary Duty, Negligence and Other Claims, and for Declaratory Judgment."

The Garrison Trusts allege that Mark transferred $9.6 million from the Garrison Family LLC and the Revocable Trust brokerage accounts at Wells Fargo to personal accounts at TD Ameritrade, that during 2008 and 2009 Mark paid Acumen over $550,000 in investment advisory fees and paid himself more than $370,000 in trustee fees, and that Mark's speculative and high-risk investments during 2008 resulted in a loss of over $20 million, leaving the "combined net value of all of the Plaintiffs' accounts,

including the Garrison Family LLC, . . . to just under $200,000."[11] The complaint asserts AIG is jointly and severally liable for the loss of over $20 million and alleges claims against AIG for negligent supervision; violation of the Washington State Securities Act (WSSA), RCW 21.20.010; and liability under a respondeat superior theory. The complaint also asserts Wells Fargo is jointly and severally liable but states the contractual duty to arbitrate precludes "nam[ing] Wells Fargo as a defendant in this action."[12]

AIG filed an answer denying liability and a cross claim for indemnification against Mark. AIG denied that it owed any duty to the Garrison Trusts and asserted it had no notice that Mark acted as an investment advisor for the Garrison Trusts or participated in private securities transactions in the Wells Fargo brokerage accounts.

AIG filed a motion for summary judgment dismissal of all claims. In support, AIG submitted the declaration of expert witness David E. Paulukaitis, a managing director of Mainstay Capital Markets Consultants Inc. Paulukaitis states, in pertinent part:

> . . . [A]ll transactions subject to the notification requirements of [NASD] Rule 3050 are excluded from the ambit of NASD Conduct Rule 3040, whether or not the associated person receives selling compensation in connection with those transactions.
>
> . . . .
> . . . The transactions effected by Mark in the Wells Fargo Accounts and the Ameritrade Personal Accounts were outside the scope of his association with [AIG] but were not "private securities transactions" as

---

[11] Emphasis in original.

[12] The complaint states, in pertinent part:

**Wells Fargo Investments, LLC** ("Wells Fargo") is a securities broker-dealer, registered with the SEC and FINRA to sell securities and conduct a securities brokerage business. The investment accounts at issue in this case were all held at Wells Fargo's Seattle, Washington branch. Plaintiff contends that Wells Fargo is jointly and severally liable for many of the losses of which Plaintiffs complain, but because the Plaintiffs all are bound by contract to arbitrate their claims against Wells Fargo in an arbitration forum administered by FINRA, Plaintiffs cannot name Wells Fargo as a defendant in this action.

(Emphasis in original.) The Garrison Trusts also state that Acumen is "judgment-proof."

defined under NASD Conduct Rule 3040. . . .

. . . Securities industry rules and regulations place no duty on [AIG] to supervise the activity in the Wells Fargo Accounts or the Ameritrade Personal Accounts. [AIG]'s duty with respect to those accounts was limited to monitoring the transactions in those accounts to ensure that they did not conflict with the interests to [AIG] or [AIG]'s customers.

The Garrison Trusts filed a motion for partial summary judgment on the grounds that AIG owed a duty to supervise the securities transactions in the Wells Fargo brokerage accounts. The Garrison Trusts submitted the declaration of expert witness John H. Chung, a chief compliance officer at three NASD member firms. Chung disagreed with AIG expert Paulukaitis. Chung states that when Mark acted as an investment advisor for compensation, AIG had a duty to supervise under NASD Rule 3040. Chung also states that AIG had a duty under NASD Rule 3050 to exercise "appropriate supervision." In his declaration, Chung states, in pertinent part:

> When a registered representative is acting as an RIA [(registered investment advisor)] for compensation and executes transactions at another broker-dealer, his actions are private securities transactions within the meaning of NASD Rule 3040. The rule cited by Mr. Paulukaitis, NASD Rule 3050 (Transactions for or by Associated Persons), does not stand for the proposition that such activity need not be supervised by the employer/broker-dealer. Instead, the rule requires that registered representatives maintaining personal or discretionary accounts at another broker-dealer to notify their employer, and permits employers so notified to elect to receive duplicate confirmations and account statements for purposes of exercising appropriate supervision over such activity.

The court denied the Garrison Trusts motion for partial summary judgment and granted the motion for summary judgment dismissal of the claims against AIG. AIG agreed to dismiss the cross claim against Mark, and the parties stipulated to entry of a final judgment under CR 54(b).

13

ANALYSIS

The Garrison Trusts contend the trial court erred by granting summary judgment dismissal of the claims against AIG for negligent supervision, violation of the WSSA, and respondeat superior.

We review summary judgment de novo and consider all the facts and reasonable inferences in the light most favorable to the nonmoving party. Hearst Commc'ns, Inc. v. Seattle Times Co., 154 Wn.2d 493, 501, 115 P.3d 262 (2005); Michael v. Mosquera-Lacy, 165 Wn.2d 595, 601, 200 P.3d 695 (2009). Summary judgment is appropriate if the pleadings, depositions, and affidavits show there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. CR 56(c). A material fact precluding summary judgment is a fact that affects the outcome of the litigation. Elcon Constr., Inc. v. E. Wash. Univ., 174 Wn.2d 157, 164-65, 273 P.3d 965 (2012). Where there are competing inferences that may be drawn from the evidence, the issue must be resolved by the trier of fact. Johnson v. UBAR, LLC, 150 Wn. App. 533, 537, 210 P.3d 1021 (2009).

Negligent Supervision

The Garrison Trusts contend that under NASD Rule 3040, AIG had a duty to supervise Mark's activities as an investment advisor for the Garrison Trusts. In the alternative, the Garrison Trusts assert that the monthly statements and trading confirmations received by AIG in accord with NASD Rule 3050 triggered the duty to investigate and monitor the activity of the Wells Fargo accounts.[13]

---

[13] The Garrison Trusts concede "breach, causation, and damages" are not at issue on appeal.

"The theory of negligent supervision creates a limited duty to control an employee for the protection of third parties, even where the employee is acting outside the scope of employment." Niece v. Elmview Grp. Home, 131 Wn.2d 39, 51, 929 P.2d 420 (1997). To establish a claim for negligent supervision, the Garrison Trusts must show (1) Mark acted outside the scope of his employment with AIG; (2) he presented a risk of harm; (3) AIG knew, or should have known in the exercise of reasonable care, that Mark posed a risk to others; and (4) AIG's failure to supervise was a proximate cause of the loss. LaPlant v. Snohomish County, 162 Wn. App. 476, 479 n.7, 271 P.3d 254 (2011). An employer is not liable for negligently supervising an employee whose conduct was outside the scope of the employment unless the employer knew, or in the exercise of reasonable care should have known, the employee presented a risk of danger to others. Thompson v. Everett Clinic, 71 Wn. App. 548, 555, 860 P.2d 1054 (1993) (citing Peck v. Siau, 65 Wn. App. 285, 294, 827 P.2d 1108 (1992)). The existence of a duty is usually a question of law that we review de novo. Aba Sheikh v. Choe, 156 Wn.2d 441, 448, 128 P.3d 574 (2006). However, "where duty depends on proof of facts that are disputed . . . summary judgment is inappropriate." Hymas v. UAP Distribution, Inc., 167 Wn. App. 136, 150, 272 P.3d 889 (2012).

The Securities Exchange Act of 1934 (Exchange Act), 15 U.S.C. sections 78a-78mm, and its amendments create a detailed, comprehensive system of federal regulation of the securities industry. Swirsky v. Nat'l Ass'n of Sec. Dealers, 124 F.3d 59, 61 (1st Cir. 1997). The Exchange Act authorizes self-regulatory organizations to promulgate their own governing rules and regulations subject to extensive oversight and control by the SEC. Mayo v. Dean Witter Reynolds, Inc., 258 F. Supp. 2d 1097, 1101

(N.D. Cal. 2003). Congress granted the SEC broad supervisory responsibilities over a system of supervised self-regulation in the securities industry. See S. REP. No. 73-792 (1934). "[T]he congressional aim in supervised self-regulation is to insure fair dealing and to protect investors from harmful or unfair trading practices." Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Ware, 414 U.S. 117, 130, 94 S. Ct. 383, 38 L. Ed. 2d 348 (1973).

NASD is a self-regulatory organization registered with the SEC. The Exchange Act authorizes the NASD "to develop and enforce rules of professional conduct for its member firms, subject to oversight by the SEC." Gurfel v. Sec. & Exch. Comm'n, 340 U.S. App. D.C. 292, 205 F.3d 400, 400 (2000) (citing 15 U.S.C. § 78o-3); see also 4 THOMAS LEE HAZEN, TREATISE ON THE LAW OF SECURITIES REGULATION 87, 89 (5th ed. 2005). With some limited exceptions, all NASD rules, policies, practices, and interpretations must be approved by the SEC. See 15 U.S.C. § 78s(b)(1); Swirsky, 124 F.3d at 62; Fiero v. Fin. Indus. Regulatory Auth., Inc., 660 F.3d 569, 572 (2d Cir. 2011). The SEC requires NASD rules and regulations conform to the Exchange Act. See 15 U.S.C. §§ 78f(b), 78o-3(b). Under the Maloney Act of 1938, 15 U.S.C. § 78o-3 et seq., NASD is also responsible for investigations of and commencing compliance with federal securities laws and regulations, and for discipline proceedings against member firms and their associated member representatives. Fiero, 660 F.3d at 571-72.

"[A] person cannot lawfully engage in the securities business unless he or she is either registered with the NASD as a broker-dealer or as a person associated with a broker-dealer." Hollinger v. Titan Capital Corp., 914 F.2d 1564, 1573 (9th Cir. 1990). As a condition of the right to engage in the securities business, broker-dealers and

16

registered representatives must abide by NASD rules and regulations. <u>As You Sow v.</u> <u>AIG Fin. Advisors, Inc.</u>, 584 F. Supp. 2d 1034, 1048 (M.D. Tenn. 2008); <u>Sec. & Exch.</u> <u>Comm'n v. Waco Fin., Inc.</u>, 751 F.2d 831, 832 (6th Cir. 1985) (broker-dealers "who belong to the NASD are required to abide by NASD Rules of Fair Practice and to meet other NASD requirements").

While NASD Rules do not create a private cause of action, courts have looked to the Rules to define the scope of a common law duty such as negligent supervision. <u>Craighead v. E.F. Hutton & Co.</u>, 899 F.2d 485, 493 (6th Cir. 1990) ("We agree with the district court that NYSE [(New York Stock Exchange)] Rule 405 does not imply a private right of action cognizable in federal court."); <u>As You Sow</u>, 584 F. Supp. 2d at 1048-49 ("violations of NASD rules alone do not give rise to actionable claims," but NASD Rule 3040 and other NASD rules "assist Tennessee and other courts in defining the extent of a legal duty at common law"); <u>McGraw v. Wachovia Sec., LLC</u>, 756 F. Supp. 2d 1053, 1075 (N.D. Iowa 2010) (recognizing duty based on NASD rules); <u>Colbert & Winstead,</u> <u>PC 401(K) Plan v. AIG Fin. Advisors, Inc.</u>, No. 3:07-1117, 2008 WL 2704367, at *10 (M.D. Tenn. July 8, 2008) (court order) ("the NASD may define the scope of a duty of a broker dealer"); <u>Cf.</u> <u>Miley v. Oppenheimer & Co.</u>, 637 F.2d 318, 333 (5th Cir. 1981) (NYSE and NASD Rules are "excellent tools" to assess reasonableness of broker's conduct); <u>Piper, Jaffray & Hopwood Inc. v. Ladin</u>, 399 F. Supp. 292, 299 (S.D. Iowa 1975) (concluding NASD and NYSE rules are "admissible as evidence of negligence"); <u>Mihara v. Dean Witter & Co.</u>, 619 F.2d 814, 824 (9th Cir. 1980) (NASD and NYSE rules "reflect the standard to which all brokers are held").

The crux of the dispute in this case is the scope of AIG's duty to supervise Mark's outside business activity as an investment advisor directing transactions in the Wells Fargo brokerage accounts. The Garrison Trusts argue the supervisory requirements of NASD Rule 3040 apply. AIG contends only the supervisory requirements of NASD Rule 3050 apply and under the plain language of NASD Rule 3040, NASD Rule 3050 transactions are excluded.

As a general overarching rule, NASD Rule 3010, Supervision (amended effective Dec. 19, 2007), requires a brokerage firm to establish, implement, and maintain a system that includes written procedures to supervise the activities of each registered representative and other associated persons reasonably designed to achieve compliance with applicable securities laws, regulations, and NASD Rules.[14]

Former NASD Rule 3030, Outside Business Activities of an Associated Person (effective Oct. 13, 1988), prohibits a registered representative from participating in outside business activity unless the employer member receives "prompt written notice." Former NASD Rule 3030 states:

> No person associated with a member in any registered capacity shall be employed by, or accept compensation from, any other person as a result of any business activity, other than a passive investment, outside the scope of his relationship with his employer firm, unless he has provided prompt written notice to the member. Such notice shall be in the

---

[14] NASD Rule 3012, Supervisory Control System (amended effective Feb. 14, 2006), also states, in pertinent part:

**(a) General Requirements**

(1) Each member shall designate and specifically identify to NASD one or more principals who shall establish, maintain, and enforce a system of supervisory control policies and procedures that (A) test and verify that the member's supervisory procedures are reasonably designed with respect to the activities of the member and its registered representatives and associated persons, to achieve compliance with applicable securities laws and regulations, and with applicable NASD rules.

Emphasis in original.

form required by the member. Activities subject to the requirements of Rule 3040 shall be exempted from this requirement.

NASD Rule 3040, "Private Securities Transactions of an Associated Person," addresses private securities transactions of a registered securities representative for compensation. "Selling compensation" is broadly defined to include "any compensation paid directly or indirectly from whatever source in connection with or as a result of the purchase or sale of a security." NASD R. 3040(e)(2). NASD Rule 3040(a) states that "[n]o person associated with a member shall participate in any manner in a private securities transaction except in accordance with the requirements of this Rule." NASD Rule 3040(b) requires the registered securities representative to provide written notice to the employer member prior to engaging in any private security transactions. NASD Rule 3040 states, in pertinent part:

**(b) Written Notice**
Prior to participating in any private securities transaction, an associated person shall provide written notice to the member with which he is associated describing in detail the proposed transaction and the person's proposed role therein and stating whether he has received or may receive selling compensation in connection with the transaction.[15]

After receiving notice of a private securities transaction, the employer member must approve or disapprove the proposed participation in private securities transactions in writing. NASD R. 3040(c)(1). NASD Rule 3040(c) states, in pertinent part:

(2) If the member approves a person's participation in a transaction pursuant to paragraph (c)(1), the transaction shall be recorded on the books and records of the member and the member shall supervise the person's participation in the transaction as if the transaction were executed on behalf of the member.
(3) If the member disapproves a person's participation pursuant to paragraph (c)(1), the person shall not participate in the transaction in any manner, directly or indirectly.

---

[15] Emphasis in original.

19

NASD Rule 3050, "Transactions for or by Associated Persons," also addresses outside business activities and expressly applies to "an account or order in which an associated person has a financial interest or with respect to which such person has discretionary authority." NASD R. 3050(e). Under NASD Rule 3050(c) and (d), prior to engaging in any transactions, a registered representative who opens an account or places an order for a securities transaction at another financial institution must notify the employer member in writing of the intent to open the account or place an order.

The other financial institution or executing member has an obligation to notify the employer member. NASD R. 3050(b). If the employer member approves engaging in transactions under NASD Rule 3050, upon written request from the employer member, the executing member must provide copies of confirmations, account statements, and other information regarding the account. NASD R. 3050(b)(2). NASD Rule 3050 states, in pertinent part:

> (c) Obligations of Associated Persons Concerning an Account with a Member
>
> A person associated with a member, prior to opening an account or placing an initial order for the purchase or sale of securities with another member, shall notify both the employer member and the executing member, in writing, of his or her association with the other member; provided, however, that if the account was established prior to the association of the person with the employer member, the associated person shall notify both members in writing promptly after becoming so associated.
>
> (d) Obligations of Associated Persons Concerning an Account with a Notice-Registered Broker/Dealer, Investment Adviser, Bank, or Other Financial Institution
>
> A person associated with a member who opens a securities account or places an order for the purchase or sale of securities with a broker/dealer that is registered pursuant to Section [78o(b)(11)] of the [Exchange] Act ("notice-registered broker/dealer"), a domestic or foreign

investment adviser, bank, or other financial institution, except a member, shall:

(1) notify his or her employer member in writing, prior to the execution of any initial transactions, of the intention to open the account or place the order; and

(2) upon written request by the employer member, request in writing and assure that the notice-registered broker/dealer, investment adviser, bank, or other financial institution provides the employer member with duplicate copies of confirmations, statements, or other information concerning the account or order;

provided, however, that if an account subject to this paragraph (d) was established prior to a person's association with a member, the person shall comply with this paragraph promptly after becoming so associated.

The purpose of NASD Rule 3050 is to prevent "potential and actual conflicts of interest raised through registered representatives' personal trading activities." Dep't of Enforcement v. Ng, No. 2009019369302, at 10 (Fin. Indus. Regulatory Auth. Nat'l Adjudicatory Council Apr. 24, 2013).[16] NASD Rule 3050 states, in pertinent part:

(a) Determine Adverse Interest

A member ("executing member") who knowingly executes a transaction for the purchase or sale of a security for the account of a person associated with another member ("employer member"), or for any account over which such associated person has discretionary authority, shall use reasonable diligence to determine that the execution of such transaction will not adversely affect the interests of the employer member.

(b) Obligations of Executing Member

Where an executing member knows that a person associated with an employer member has or will have a financial interest in, or discretionary authority over, any existing or proposed account carried by the executing member, the executing member shall:

(1) notify the employer member in writing, prior to the execution of a transaction for such account, of the executing member's intention to open or maintain such an account;

---

[16] Available at http://www.finra.org/web/groups/industry/@ip/@enf/@adj/documents/nacdecisions/p249257.pdf.

(2) upon written request by the employer member, transmit duplicate copies of confirmations, statements, or other information with respect to such account; and

(3) notify the person associated with the employer member of the executing member's intention to provide the notice and information required by subparagraphs (1) and (2).

The Garrison Trusts concede that from 2006 to 2007, AIG complied with NASD Rule 3050. The concession is well taken. In compliance with NASD Rule 3050, Wells Fargo, as the executing member, expressly requested written approval from AIG to allow Mark to act as the "trustee, owner and manager" of the Garrison trusts and Garrison Family LLC for the brokerage accounts at Wells Fargo. In the November 14, 2006 letter of understanding from the AIG Compliance Department to Mark concerning the request, AIG does not object to Mark acting "solely as the trustee/owner/manager" on the condition that he is prohibited from acting in any other capacity and that he annually disclose the Wells Fargo activity in the AIG OBAQ. In a letter dated November 22, AIG also requested monthly account statements and trading confirmations from Wells Fargo for the brokerage accounts and specifically stated that the NASD regulations require the First Line Supervisor to monitor the Wells Fargo accounts.

The Garrison Trusts claim that when Mark hired Acumen in March 2007 to provide investment advice for a fee, AIG had a duty to supervise under NASD Rule 3040. The Garrison Trusts argue that only transactions "for which no associated person receives any selling compensation"[17] are excluded from the requirements of NASD Rule 3040. AIG asserts that because the plain language of NASD Rule 3040 excludes all transactions subject to NASD Rule 3050, the requirements of NASD Rule 3040 do not

---

[17] NASD R. 3040(e)(1).

22

apply.

Interpretation of statutes and regulations is a question of law this court reviews de novo. Skinner v. Civil Serv. Comm'n, 168 Wn.2d 845, 849, 232 P.3d 558 (2010). NASD Rule 3040 applies only to "private securities transactions." Rule 3040 defines "private securities transaction" as transactions outside "the regular course or scope of an associated person's employment" and excludes three discrete categories of transactions from the definition. "Private securities transaction" is defined as follows:

> "Private securities transaction" shall mean any securities transaction outside the regular course or scope of an associated person's employment with a member, including, though not limited to, new offerings of securities which are not registered with the Commission, provided however that transactions subject to the notification requirements of Rule 3050, transactions among immediate family members (as defined in Rule 2790), for which no associated person receives selling compensation, and personal transactions in investment company and variable annuity securities, shall be excluded.

NASD R. 3040(e)(1).[18]

The definition of "private securities transaction" clearly excludes three distinct categories of transactions: (1) transactions subject to the requirements of NASD Rule 3050, (2) transactions among immediate family members under Rule 2790, and (3) personal transactions in investment company and variable annuity securities. NASD R. 3040(e)(1). The question is whether the phrase "for which no associated person receives any selling compensation" applies only to the immediately preceding phrase "transactions among immediate family members" or to both the preceding phrase that

---

[18] Former NASD Rule 2790(i)(5), Restrictions on the Purchase and Sale of Initial Equity Public Offerings (amended effective Sept. 5, 2007), defines "immediate family member" as "a person's parents, mother-in-law or father-in-law, spouse, brother or sister, brother-in-law or sister-in-law, son-in-law or daughter-in-law, and children, and any other individual to whom the person provides material support." The definition of "immediate family member" does not include grandparents. The parties do not contend this exclusion applies.

excludes NASD Rule 3050 transactions and the phrase that excludes immediate family member transactions. See NASD R. 3040(e)(1).

Under the "last antecedent rule" of statutory construction, a qualifying phrase refers to the last antecedent unless there is " 'a comma before the qualifying phrase.' " Berrocal v. Fernandez, 155 Wn.2d 585, 593, 121 P.3d 82 (2005) (quoting In re Sehome Park Care Ctr., Inc., 127 Wn.2d 774, 781, 903 P.2d 443 (1995)). A comma before the qualifying phrase indicates that the phrase " 'is intended to apply to all antecedents instead of only the immediately preceding one.' " Berrocal, 155 Wn.2d at 593[19] (quoting Sehome Park, 127 Wn.2d at 782). Here, use of the comma before the qualifying phrase "for which no associated person receives any selling compensation" means the qualifying phrase applies to both preceding antecedents: "transactions subject to the notification requirements of Rule 3050" and "transactions among immediate family members . . . for which no associated person receives selling compensation."[20]

The Garrison Trusts also cite NASD Notice to Members (NTM) 94-44, Board Approves Clarification on Applicability of Article III, Section 40 of Rules of Fair Practice to Investment Advisory Activities of Registered Representatives, and NASD NTM 96-33, NASD Clarifies Rules Governing RR/IAs [(Registered Representative/Investment Advisors)], in support of the argument that AIG had a duty to supervise Mark's activities as an investment advisor receiving selling compensation and directing securities transactions in the Wells Fargo brokerage accounts.

A number of NTMs address the application of NASD Rule 3040 where an associated registered representative is also acting as a registered investment adviser.

---

[19] Emphasis in original.
[20] NASD R. 3040(e)(1).

Courts may give substantial deference to NASD's interpretation of its own rules. Dawson v. N.Y. Life Ins. Co., 135 F.3d 1158, 1168 (7th Cir. 1998); Ronay Family Ltd. P'ship v. Tweed, 216 Cal. App. 4th 830, 842, 157 Cal. Rptr. 3d 680 (2013); Siegel v. Sec. & Exch. Comm'n, 389 U.S. App. D.C. 94, 592 F.3d 147, 155 (2010); see also York Research Corp. v. Landgarten, 927 F.2d 119, 123 (2d Cir. 1991).

In NASD NTM 91-32, Request for Comments on Compensation Arrangements for Activities of Registered Representatives Who Are Also Registered with the Securities and Exchange Commission as Investment Advisers, NASD states that NASD Rule 3040 "should apply to all investment advisory activities conducted by registered representatives other than their activities on behalf of the member that result in the purchase or sale of securities by the associated person's advisory clients." According to NASD NTM 91-32, "to conclude otherwise would permit registered persons to participate in securities transactions outside the scope of the oversight and supervision of the employer member and of a self-regulatory organization to the potential detriment of customers."

NASD NTM 94-44 states that "[i]n clarifying its previous position in Notice to Members 91-32, the Board [of Governors] focused primarily upon the RR/RIA's [(registered representative/registered investment advisor's)] participation in the execution of the transaction—meaning participation that goes beyond a mere recommendation." NASD NTM 94-44 describes an example of where the transaction of a registered representative acting as a registered investment advisor would trigger the requirements of NASD Rule 3040:

> An example of a RR/RIA clearly participating in the execution of trades is where he or she enters an order on behalf of the customer for particular

securities transactions either with a brokerage firm other than the member they are registered with, directly with a mutual fund, or with any other entity, including another adviser, and receives any compensation for the overall advisory services.

NASD NTM 96-33 specifically reiterates that a dually licensed registered representative and investment advisor must provide prior written notice to the member before engaging in any investment advisory activity for a fee. NASD NTM 96-33 states, in pertinent part, "A member must receive prior written notice from an RR/IA requesting approval to conduct investment advisory activities for an asset-based or performance-based fee on behalf of each of his or her advisory clients." NASD NTM 96-33 states the prior written notice "must include details such as:"

- a declaration that the individual is involved in investment advisory activities;

- the identity of each customer to whom the notice would apply;

- the types of securities activities that may be executed away from the firm;

- a detailed description of the role of the RR/IA in the investment advisory activities and services to be conducted on behalf of each identified customer;

- information regarding the RR/IA's discretionary trading authority, if any;

- compensation arrangements;

- the identity of broker/dealers through which trades away will be executed; and

- customer financial information.

NASD NTM 96-33 specifically directs a registered securities representative/investment advisor such as Mark to provide the employer member with "a subsequent written notice that details" the change in his role. NASD NTM 96-33

26

states, in pertinent part:

> Only after written approval from the NASD member may the RR/IA engage in the disclosed activities. If there is a change in the RR/IA's proposed role or activities for any customer from what the member initially approved, the RR/IA must provide the member with a subsequent written notice that details the changes and requests the member's further approval to conduct advisory activities on behalf of the customer. The employer member must thereafter record subsequent transactions on its books and records and supervise activity in the affected accounts as if it were its own.

Here, the undisputed record shows that Mark did not comply with the requirement to obtain prior written approval before hiring Acumen in March 2007 to provide investment advice for the Wells Fargo brokerage accounts. Nor did Mark comply with the requirement to provide AIG with written notice that his role had changed from trustee and manager of the Garrison trusts and the Garrison Family LLC to investment advisor. The undisputed record also shows that Mark acted as an investment advisor receiving selling compensation and directed private securities transactions in the Wells Fargo brokerage accounts. The dispositive question is whether AIG knew or should have known that Mark's role had changed from trustee and manager of the Garrison trusts and Garrison Family LLC under NASD Rule 3050 to acting as an investment advisor directing transactions for a fee in the Wells Fargo brokerage accounts, thereby triggering compliance with NASD Rule 3040.

The Garrison Trusts rely on the two annual OBAQs Mark submitted to AIG for 2005 to 2006 and 2007 to show AIG had notice triggering the duty to supervise under NASD Rule 3040. The Garrison Trusts contend the difference between the two OBAQs provided notice to AIG that Mark was acting as an investment advisor and receiving selling compensation.

In the 2005 to 2006 OBAQ, Mark reported he was "Trustee/Owner/Manager" for the Wells Fargo accounts and stated he received "[u]nder $10,000" for this activity. The 2005 to 2006 OBAQ states, in pertinent part:

**VI.    Other Activities**
**1.    Are you involved in any other Outside Business Activities?**
Yes.

**1.1.    What is your full title?**
- Trustee/Owner/Manager

**1.2.    Please disclose, in detail, all of your duties and responsibilities in this position:**
- I have been named the Trustee/Owner/Manager on accounts held at Wells Fargo Investments in Seattle, WA, for my grandfather - Jack Garrison.

. . . .

**1.4.    Please indicate the percentage of time you spend conducting this activity:**
0-25%

**1.5.    Please indicate the average annual dollar amount of compensation that you receive:**
Under $10,000.[21]

By contrast, in the 2007 OBAQ dated October 30, 2007, Mark reports not only that he is the "Trustee/Owner/Manager" on the accounts held at Wells Fargo but also that it is "an Investment related activity" conducted under his independent financial advice business Acumen.[22] The October 30, 2007 OBAQ submitted by Mark states, in pertinent part:

**1.    Please select the category for this activity: (If you are currently not participating in any of these below activities, please select "No Activity")**
Other

---

[21] Emphasis in original.
[22] Emphasis in original.

28

. . . .

**1.2.** **Is this an <u>Investment</u> related activity?**
Yes

**1.3.** **What is the name of the business this activity is conducted under?**
- Acumen Financial Group, Inc.

**1.4.** **What is the nature or structure of the business? Please select from the following:**
- Registered Investment Adviser

. . . .

**1.6.** **What is your position/title for this activity? Please select from the following:**
Owner

**1.7.** **Please enter the date you started this activity:**
- 10-16-1995

**1.8.** **Please enter the approximate number of hours/month you spend on this activity:**
- 16

**1.9.** **Please enter the approximate number of hours you spend on this activity during securities trading hours:**
- 16

**1.10.** **Please provide a description of your duties:**
- I have been named the Trustee/Owner/Manager on accounts held at Wells Fargo Investments in Seattle, WA, for my grandfather - Jack Garrison.

. . . .

**1.12.** **Please indicate the average annual dollar amount of compensation that you receive:**
$25,000 to $50,000.[23]

Because the OBAQ submitted in October 2007 does not comply with the written

notice requirements set forth in NASD Rule 3040(b) and NASD NTM 96-33, the 2007

---

[23] Emphasis in original.

OBAQ standing alone may not have provided AIG with notice that Mark's role had changed in March 2007 and that he was acting as the investment advisor for compensation rather than solely as the trustee and manager of the Garrison trusts and Garrison Family LLC brokerage accounts at Wells Fargo. However, when coupled with the directive from AIG and the "AIG Financial Advisors Sales Practice Manual," there is a genuine issue of material fact as to whether AIG knew or should have known that by October 2007, Mark was acting as an investment advisor for the Wells Fargo brokerage accounts and receiving selling compensation. The AIG manual states that "[o]n an annual basis, RRs are required to disclose to the Firm, via the OBAQ, any outside business activities prior to engaging in such activity."

The Garrison Trusts also assert that even if AIG did not have notice triggering the supervisory requirements of NASD Rule 3040, the monthly statements and trading confirmations AIG received under NASD Rule 3050 revealed suspicious circumstances or "red flags" triggering the duty to investigate or monitor the transactions in the Wells Fargo brokerage accounts. Under NASD Rule 3050, both Wells Fargo as the executing member and AIG as the employer member had an obligation to review the monthly account statements and securities transaction confirmation slips for the Wells Fargo brokerage accounts, not only for insider trading and conflicts of interest but also for unapproved outside business activities and suspicious circumstances.

In McGraw, the plaintiffs alleged the employer member Wachovia owed them a duty to supervise the outside activities of an associated stockbroker. McGraw, 756 F. Supp. 2d at 1058-59. The court cites the general rule that absent notice, " 'a broker-dealer owes no duty to a non-customer who has invested money through an

30

independent investment advisor' " but notes " 'this general proposition of non-liability is far from a per se rule.' " McGraw, 756 F. Supp. 2d at 1072[24] (quoting Bear Stearns & Co. v. Buehler, 23 App'x 773, 775 (9th Cir. 2001)). The court describes the well-defined exception to the general rule as follows:

> "Where there is additional involvement by the broker-dealer, a duty may be found. In Software Design[ & Appl. v. Hoefer & Arnett, Inc.], the court noted that 'sufficiently suspicious' circumstances may place a broker-dealer on notice that her customer is perpetrating fraud on non-customer investors. 49 Cal. App. 4th [472, ]483, 56 Cal. Rptr. 2d 756[ (1996)]. Once aware of troublesome 'red flags,' the broker-dealer may have a duty which runs to non-customers to monitor and investigate any unusual account activity. [Software Design, 49 Cal. App. 4th at 483]; see also City of Atascadero v. Merrill Lynch[, Pierce, Fenner & Smith, Inc.], 68 Cal. App. 4th 445, 483-84, 80 Cal. Rptr. 2d 329 (1998) (finding trustee-investors, who had no direct contact with Merrill Lynch, could nonetheless state a claim for breach of fiduciary duty if Merrill Lynch actively participated in broker's fraud)."

McGraw, 756 F. Supp. 2d at 1072[25] (quoting Bear Stearns, 23 App'x at 776).

Accordingly, the court held:

> Although brokerage firms generally are not responsible for supervising any outside business activities or private securities transactions engaged in by their representatives, unless they have received notice of or have approved those activities, they do have a duty to monitor and investigate activities for which they have had no proper notice, if there is evidence of "red flags" that would alert the brokerage firm to the possibility of undisclosed outside activities.

McGraw, 756 F. Supp. 2d at 1075.

Here, it is undisputed that AIG complied with the requirements of NASD Rule 3050 when it approved Mark acting as the trustee and manager of the Garrison trusts and Garrison Family LLC for the Wells Fargo brokerage accounts. Beginning in 2006, AIG received monthly account statements and confirmation slips from Wells Fargo for

---

[24] Emphasis in original.
[25] Most alterations in original.

31

trading transactions in the brokerage accounts for the Garrison trusts and the Garrison Family LLC. In December 2007, AIG also approved personal brokerage accounts at TD Ameritrade for Mark and Michelle Garrison. From early 2008 to April 2009, AIG received confirmation slips and account statements for the personal brokerage accounts at TD Ameritrade.

An excerpt from the AIG Financial Advisors Sales Practice Manual describes the First Line Supervisor's responsibility for monitoring outside business activities and the annual OBAQ report. The manual appears to require the First Line Supervisor not only to review the OBAQ "for any potential conflict with the Firm's business" but also to "[q]uestion RR regarding potential unapproved outside business activities referenced in OBAQ/ACQ [(outside business activities questionnaire/annual compliance questionnaire)] or other red flags or indications of misunderstanding of Firm or Regulatory policies."[26]

Viewing the evidence in the light most favorable to the Garrison Trusts, there are material issues of fact as to whether suspicious activity or red flags required AIG to investigate and monitor Mark's activity in the Wells Fargo accounts. For example, there are material issues of fact as to whether the information Mark submitted in the October 2007 OBAQ required the AIG First Line Supervisor to investigate potential unapproved outside business activity as an investment advisor for the Garrison trusts and the Garrison Family LLC. The Garrison Trusts also presented evidence that Mark changed the nature of the investments between January 2007 and November 2008, and that by November 2008, Mark had transferred more than $9.6 million from the Wells Fargo

---

[26] AIG's internal manual is evidence of the standard of care. Joyce v. Dep't of Corr., 155 Wn.2d 306, 324, 119 P.3d 825 (2005) ("Internal directives, department policies, and the like may provide evidence of the standard of care and therefore be evidence of negligence.").

accounts to his personal brokerage TD Ameritrade accounts.

WSSA

The Garrison Trusts contend that as a matter of law, AIG is a "control person" under the WSSA, RCW 21.20.430(3). In the alternative, the Garrison Trusts contend material issues of fact preclude dismissal of the "control person" claim.

Under the WSSA, it is unlawful to engage in fraud or deceit in connection with the offer, sale, or purchase of any security. RCW 21.20.010. RCW 21.20.430(3) states that certain persons may be secondarily liable for a violation of the act:

> Every person who directly or indirectly controls a seller or buyer liable under subsection (1) or (2) above, every partner, officer, director or person who occupies a similar status or performs a similar function of such seller or buyer, every employee of such a seller or buyer who materially aids in the transaction, and every broker-dealer, salesperson, or person exempt under the provisions of RCW 21.20.040 who materially aids in the transaction is also liable jointly and severally with and to the same extent as the seller or buyer, unless such person sustains the burden of proof that he or she did not know, and in the exercise of reasonable care could not have known, of the existence of the facts by reason of which the liability is alleged to exist.

In Hines v. Data Line Systems, Inc., 114 Wn.2d 127, 787 P.2d 8 (1990), our state Supreme Court established a two-prong test to establish whether a defendant is a "control person":

> "[F]irst, that the defendant . . . actually participated in (i.e., exercised control over) the operations of the corporation in general; then he must prove that the defendant possessed the power to control the specific transaction or activity upon which the primary violation is predicated, but he need not prove that this later power was exercised."

Hines, 114 Wn.2d at 136[27] (quoting Metge v. Baehler, 762 F.2d 621, 630-31 (8th Cir. 1985)). The plaintiff does not need to show that the defendant " 'culpably participated' " to establish control person liability. Hines, 114 Wn.2d at 137. Because there are

---

[27] Emphasis in original, alteration in original, internal quotation marks omitted.

material issues of fact as to whether AIG knew or should have known Mark was acting as an investment advisor rather than as only the trustee and manager, we conclude there are also genuine issues of material fact as to the extent to which AIG could exercise control over the transactions in the Wells Fargo accounts. See also Hollinger, 914 F.2d at 1574 ("The broker-dealer's ability to deny the representative access to the markets gives the broker-dealer effective control over the representative at the most basic level.").[28]

Respondeat Superior

The Garrison Trusts also contend the court erred by dismissing its claim that AIG was liable based on respondeat superior. We disagree.

Respondeat superior, or vicarious liability, imposes liability on an employer for the torts of an employee who is acting on the employer's behalf within the scope of employment. Niece, 131 Wn.2d at 48. Respondeat superior is analytically distinct and separate from a cause of action for negligent hiring, retention, and supervision. Niece, 131 Wn.2d at 48.

Here, it is undisputed that Mark's actions as a registered investment advisor were outside the scope of his employment with AIG. Nonetheless, the Garrison Trusts contend AIG is liable under a respondeat superior theory because as an AIG branch office manager, Mark was responsible for supervising his own outside business activities. But the undisputed record establishes an AIG First Line Supervisor was responsible for supervising and reviewing Mark's outside business activities as the

---

[28] The Garrison Trusts also cite Hollinger, 914 F.2d at 1564, to argue that a broker-dealer is always a control person of a registered representative under the WSSA. We disagree with that argument. The two-prong test in Hines determines whether AIG was a "control person." See Hines, 114 Wn.2d at 136.

trustee and manager of the Garrison trusts and the Garrison Family LLC, as well as the TD Ameritrade personal accounts. We conclude the court did not err by dismissing the respondeat superior claim.

In sum, we affirm summary judgment dismissal of the respondeat superior claim but reverse summary judgment dismissal of the claims against AIG for negligent supervision and violation of the WSSA, and remand for trial.[29]

WE CONCUR:

_____, C.J.

_____ Cox, J.

---

[29] Because we reverse, we need not address the argument that the court erred in denying the motion for reconsideration.